## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL TREASURY EMPLOYEES UNION<br>1750 H Street, N.W.<br>Washington, D.C.  20006, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 19-50 |
| United States of America, | ) ) | |
| and | ) ) | |
| JOHN MICHAEL MULVANEY, in his<br>official capacity as Director of the Office of<br>Management and Budget | ) ) ) | |
| Defendants. | ) ) | |

---

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF PLAINTIFF NTEU'S
## MOTION FOR A TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

GREGORY O'DUDEN
General Counsel

LARRY J. ADKINS
Deputy General Counsel

PARAS N. SHAH
Assistant Counsel

ALLISON C. GILES
Assistant Counsel

JESSICA HORNE
Assistant Counsel

NATIONAL TREASURY EMPLOYEES UNION
1750 H Street N.W.
Washington, D.C. 20006
Tel: (202) 572-5500
Fax: (202) 572-5645
Email: greg.oduden@nteu.org
Email: larry.adkins@nteu.org
Email: paras.shah@nteu.org
Email: allie.giles@nteu.org
Email: jessica.horne@nteu.org

## TABLE OF CONTENTS

Page:

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 2

I.     NTEU's Claims Will Likely Succeed. ............................................................. 3

       A.  Section 1342 of the Antideficiency Act Plainly Conflicts with the
           Constitution's Appropriations Clause........................................................ 3

           1.  The Framers Intended the Appropriations Clause to Vest Congress
               with the Exclusive Power to Make Spending Decisions. ........................ 4

           2.  The Antideficiency Act Was Originally Intended to Enforce the
               Appropriations Clause. ........................................................................... 5

           3.  Section 1342 of the Antideficiency Act is Contrary to the Framers'
               Intent, as Embodied by the Appropriations Clause, and is
               Unconstitutional..................................................................................... 6

       B.  OMB's Directive to Agencies Conflicts with Section 1342 of the
           Antideficiency Act.................................................................................. 10

II.    NTEU and Its Members Will Suffer Irreparable Harm if Immediate
       Injunctive Relief Does Not Issue. .................................................................. 14

III.   The Balance of Equities Tips in NTEU's Favor, and the Public Interest Will
       Be Served by Immediate Injunctive Relief. .................................................... 17

CONCLUSION............................................................................................................ 18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

<u>Am. Fed. of Gov't Emps. et al v. Rivlin</u>,
   995 F. Supp. 165 (D.D.C. 1998).............................................................................. 10

<u>J.W. Hampton, Jr. & Co. v. United States</u>,
   276 U.S. 394 (1928) ................................................................................................ 7

<u>Mistretta v. United States</u>,
   488 U.S. 361, 372-73 (1989). .................................................................................. 9

<u>New Mexico v. Richardson</u>,
   39 F. Supp. 2d 48 (D.D.C. 1999) ............................................................................ 3

*<u>Office of Pers. Mgmt. v. Richmond</u>,
   496 U.S. 414 (1990) ....................................................................................... 4, 8, 9

<u>Sierra Club v. United States Army Corps of Eng'rs</u>,
   990 F. Supp. 2d 9 (D.D.C. 2013) ...................................................................... 2-3, 14

<u>WMATA v. Holiday Tours, Inc.</u>,
   559 F.2d 841 (D.C. Cir. 1977) ................................................................................ 3

**Statutes**

5 U.S.C. § 701, <u>et</u> <u>seq.</u> .............................................................................................. 14

31 U.S.C. § 1341........................................................................................... 1, 3, 5, 6

31 U.S.C. § 1341(a) ................................................................................................ 5

31 U.S.C. § 1342.........................................................................................*passim*

**Constitutional Provisions**

U.S. Const., Art. I, § 8, cl. 1-2................................................................................ 8

U.S. Const., Art. I, § 9, cl. 7................................................................................ 4, 8

**Other Authorities**

2 J. Story, Commentaries on the Constitution of the United States §
   1348 (3d ed. 1858)................................................................................................. 5

Brady McCombs and Juliet Linderman, <u>Payday Without Pay Hits</u>
<u>Federal Workers As Shutdown Drags On</u> (Jan. 10, 2019) .................................. 15

11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal
Practice and Procedure § 2948.1 (2d ed. 2013) ...................................... 14

Darla Mercado, "White House Promises Tax Refunds Will Go Out, But
There's Hardly Anyone At The IRS To Do The Work," CNBC.com
(Jan. 7, 2019) ............................................................................................. 13

<u>The Federalist No. 58</u> (J. Cooke ed. 1961) ................................................... 4

Fenster and Volz, <u>The Anti-Deficiency Act, Constitutional Control</u>
<u>Gone Astray</u>, 11 Pub. Contract J. 155, 159-62 (1979) ........................................ 5, 7

H.R. Conf. Rep. No. 101-964, at 1170 (1990) ............................................... 11

Hayley Miller, "Mick Mulvaney: Government Shutdown Likely To
'Drag On A Lot Longer,'" HuffingtonPost.com (Jan. 6, 2019) ............................. 15

Hon. Abner Mikva, <u>Congress:  The Purse, The Purpose, and the Power</u>,
21 Ga. L. Rev. 1, 3 (1986). ........................................................................ 4

Kate Stith, <u>Congress' Power of the Purse</u>, 97 Yale L. J. 1343 (1988) ................. 6, 8, 9

Memorandum for Alice Rivlin, Director, Office of Management and
Budget, from Walter Dellinger, Assistant Attorney General, Office
of Legal Counsel, Re: Government Operations in the Event of a
Lapse in Appropriations at 8 (Aug. 16, 1995). .................................................. 6, 12

Memorandum for the Heads of Executive Departments and Agencies,
from Mich Mulvaney, Director, Re: Planning for Agency Operations
During a Potential Lapse in Appropriations (Jan. 19, 2018) .............................. 11

OMB Circular No. A-11 ................................................................................ 11

# INTRODUCTION

Plaintiff National Treasury Employees Union (NTEU) brings this lawsuit, and seeks emergency and preliminary injunctive relief, on behalf of its members who are being forced to work without pay during the current lapse in appropriations affecting several executive branch agencies at which NTEU represents bargaining unit employees.[1]

Notwithstanding the ongoing lapse in appropriations, tens of thousands of federal employees represented by NTEU have been required to report to work since December 22, 2018.  In directing employees excepted from the partial government shutdown to report to work, the defendants have purported to rely on the Antideficiency Act, 31 U.S.C. §§ 1341, 1342.

Consistent with the Constitution's Appropriations Clause, Section 1341 of the Act prohibits agencies from involving the government "in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." 31 U.S.C. § 1341.  The later-enacted Section 1342, however, provides an exception at odds with that flat prohibition.  It provides that the United States may "employ personal services exceeding that authorized by law" in "emergencies involving the safety of human life or the protection of property."  31 U.S.C. § 1342.  Section 1342

---

[1] Those agencies include the Internal Revenue Service (and other Department of Treasury offices and bureaus), United States Custom and Border Protection, the Federal Law Enforcement Training Center, the Commodity Futures Trading Commission, the Environmental Protection Agency, the Federal Communications Commission, the Food and Drug Administration, the Federal Elections Commission, the National Parks Service, the Patent and Trademark Office, the Securities and Exchange Commission, and the United States Department of Agriculture.

contains no limitation, moreover, on the amount of funds that may be obligated for such services.

NTEU's primary claim is that Section 1342 violates the Constitution's Appropriations Clause by (1) authorizing executive branch agencies to obligate funds in advance of appropriations; and (2) providing no standard or limit for the amount that executive branch agencies may obligate in advance of appropriations. NTEU thus seeks a declaration that Section 1342 is unconstitutional and asks this Court to enjoin defendants from giving effect to Section 1342, including by requiring NTEU members to work during a period of lapsed appropriations.

Alternatively, if Section 1342 is held to be constitutional, NTEU argues that the Office of Management and Budget (OMB) directive issued in January 2018 to executive branch agencies regarding a lapse in appropriations illegally conflicts with Section 1342's plain text. That OMB directive and the authorities on which it depends has allowed executive branch agencies to designate a far broader swath of "excepted" employees for purposes of a government shutdown than Section 1342's text allows. NTEU thus seeks a declaration that OMB's directive is illegal and asks this Court to enjoin agency reliance on it.

## ARGUMENT

A party seeking a temporary restraining order or preliminary injunction must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. Sierra

<u>Club v. United States Army Corps of Eng'rs</u>, 990 F. Supp. 2d 9, 24 (D.D.C. 2013) (quotation marks and alterations omitted).  "In conducting an inquiry into these four factors, a district court must balance the strengths of the requesting party's arguments in each of the four required areas.  If the showing in one area is particularly strong, an injunction may issue even if the showings in other areas are rather weak."  <u>Id.</u> (quotation marks, alterations, and ellipsis omitted).

## I.      NTEU's Claims Will Likely Succeed.

To establish a likelihood of success on the merits, NTEU must show that a "serious legal question" is at issue.  <u>WMATA v. Holiday Tours, Inc.</u>, 559 F.2d 841, 844 (D.C. Cir. 1977).  "The court is not required to find that ultimate success by the movant is a mathematical probability, and indeed, the court may grant an injunction even though its own approach may be contrary to movants' view of the merits."  <u>New Mexico ex rel. v. Richardson</u>, 39 F. Supp. 2d 48, 50 (D.D.C. 1999) (alterations omitted).

### A.      Section 1342 of the Antideficiency Act Plainly Conflicts with the Constitution's Appropriations Clause.

The federal government has required employees to report for work without pay under the authority of Section 1342 of the Antideficiency Act, 31 U.S.C. § 1341 <u>et</u> <u>seq.</u>  When viewed against the backdrop of the Constitution's Appropriations Clause, Section 1342 is flatly unconstitutional.

3

1.    **The Framers Intended the Appropriations Clause to Vest Congress with the Exclusive Power to Make Spending Decisions.**

The Constitution provides, in distinct and unequivocal terms, "No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const., Art. I, § 9, cl. 7. This provision prohibits the executive branch from authorizing payment or incurring obligations to pay, absent congressionally-enacted appropriations. See Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 427-28 (1990).

The "fundamental and comprehensive purpose" of the Appropriations Clause is "to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress." Id. The Clause is a "reservation of congressional control over funds in the Treasury" on "[a]ny exercise of a power granted by the Constitution to one of the other Branches of Government." Id. at 425.

Maintaining the integrity and independence of Congress's power of the purse, as embodied in Article I, Section 9, is crucial to upholding the system of government that the Framers envisioned. They deliberately placed spending power in the hands of Congress and outside the grasp of the President. As James Madison explained, this power "may, in fact, be regarded as the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people." The Federalist No. 58, at 394 (J. Cooke ed. 1961).

The Framers thus intended that the power of the purse be exercised by only "our most representative of institutions" and not by the President. Hon. Abner Mikva, Congress: The Purse, The Purpose, and the Power, 21 Ga. L. Rev. 1, 3

4

(1986).  If it were otherwise, as Justice Story presciently observed, "the executive would possess an unbounded power over the public purse of the nations and might apply all its moneyed resources at his pleasure."  2 J. Story, Commentaries on the Constitution of the United States § 1348 (3d ed. 1858).

### 2.    The Antideficiency Act Was Originally Intended to Enforce the Appropriations Clause.

In 1870, Congress enacted the Antideficiency Act to address the increasingly common problem of the executive branch obligating funds in advance of appropriations—which put pressure on Congress to then appropriate those funds, so that creditors could be paid.  See, e.g., Fenster and Volz, The Anti-Deficiency Act, Constitutional Control Gone Astray, 11 Pub. Contract J. 155, 159-62 (1979).   The Act, as passed, did not include what is now Section 1342 of Title 31; that section, as discussed below, provides an illegal exception to the firm mandates of Section 1341 of the Act.

Section 1341, consistent with the Appropriations Clause, assiduously protects Congress's power of the purse.  It provides, unequivocally, that a federal official may not (1) "make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation"; or (2) "involve" the federal government "in a contract or obligation for the payment of money before an appropriation is made unless authorized by law."  31 U.S.C. § 1341(a).

Thus, Congress enacted this language to enforce the Appropriations Clause.  As the Justice Department has recognized, it "implements the constitutional

requirement that 'No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law.'"  <u>See</u> Memorandum for Alice Rivlin, Director, Office of Management and Budget, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, Re: Government Operations in the Event of a Lapse in Appropriations at 3 (Aug. 16, 1995).[2]

Therefore, Section 1341 of the Antideficiency Act forbids not only the actual expenditure of appropriated funds, but also their obligation.  Indeed, the entire point of the Act was to preclude executive branch agencies from incurring obligations or borrowing money "in anticipation of future appropriations," which would undermine Congress's power of the purse.  Kate Stith, <u>Congress' Power of the Purse</u>, 97 Yale L. J. 1343, 1371-72 (1988).

> ### 3. Section 1342 of the Antideficiency Act is Contrary to the Framers' Intent, as Embodied by the Appropriations Clause, and is Unconstitutional.

**a.**  The Antideficiency Act was amended in 1905 to include what is now Section 1342, the section that NTEU argues contravenes the Appropriations Clause. That section purports to authorize federal agencies to "accept voluntary services . . . or employ personal services exceeding that authorized by law" if those services are "for emergencies involving the safety of human life or the protection of property." 31 U.S.C. § 1342.  Section 1342 contains no limitation whatsoever on the amounts

---

[2] A copy of this memorandum is available at https://www.justice.gov/sites/default/files/olc/opinions/attachments/2016/04/22/1995-08-16-lapse-in-appropriations-2.pdf.

that the executive branch may obligate to employ personal services for such "emergencies."  See id.

Section 1342 is unconstitutional to the extent that it has the effect of authorizing the executive branch to obligate funds in advance of appropriations. Allowing the executive branch to usurp the legislative prerogative by incurring unauthorized obligations distorts our Constitution's scheme and undermines Congress's power of the purse.  The incurring of these obligations by the executive branch exerts a hydraulic pressure on Congress to fulfill those obligations or, instead, to risk the "full faith and credit" of the United States.  See Fenster & Volz, The Anti-Deficiency Act:  Constitutional Control Gone Astray, at 160.

Section 1342 thus unconstitutionally purports to transfer fundamental legislative spending authority by bestowing on the President the far-reaching power to incur substantial financial obligations.  As Chief Justice Taft made clear, "it is a breach of the National fundamental law if Congress gives up its legislative power and transfers it to the President . . . ."  J.W. Hampton, Jr. & Co. v. United States, 276 U.S. 394, 406 (1928).

**b.** The government may argue that Congress, pursuant to Article I, Section 8, Clauses 1 and 2, has the constitutional authority "[t]o borrow money on the credit of the United States" and "to pay the Debts . . . of the United States," even in the absence of duly enacted appropriations laws, and that Section 1342 represents a valid delegation of this power to the executive branch.  This argument would be without merit.

As an initial matter, the factual premise for this argument would be quite dubious:  it is difficult, if not impossible, to see how an open-ended obligation on the Treasury to pay for personal services constitutes an exercise of Congress's power to borrow money or pay debt.  But even if such a connection existed, the government's argument would still fail.

First, the exercise of Congress's enumerated powers to pay debt and borrow money (U.S. Const., Art. I, § 8, cl. 1-2) are subject to the prohibitions of the Appropriations Clause, which provides that "No money shall be drawn from the Treasury except in consequence of Appropriations made by Law."  U.S. Const., Art. I, § 9, cl. 7.  Thus, the central premise of the government's argument would be that the Appropriations Clause is not implicated by obligating the Treasury, but only by actually withdrawing money from it.  The Clause, however, is more than a technical provision regarding how disbursals of funds shall be accomplished.  Its fundamental purpose is to ensure that public funds will be spent in accordance with Congress's judgments.  Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 427-28 (1990).

Consistent with that understanding, a key function of the Clause is to require that Congress determine not only to what end money will be spent, but the amount of money to be drawn from the Treasury to serve a particular end.  See Kate Stith, Congress' Power of the Purse, 97 Yale L. J. 1343, 1346 (1988).  When Congress purports to obligate funds without any delineation of the amount obligated, as is the case with Section 1342, a serious question exists as to whether Congress has

adequately "reserv[ed] . . . control over funds in the Treasury," as the Constitution contemplates.  Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 425 (1990).

Second, the Supreme Court has held a conferral of legislative authority cannot be sustained unless Congress "clearly delineates . . . the boundaries of [the] delegated authority."  Mistretta v. United States, 488 U.S. 361, 372-73 (1989).  In other words, Congress's delegation must be "sufficiently specific and detailed."  Id. at 374.  Section 1342 cannot be a valid delegation of congressional power, for it imposes no limits or standards whatsoever on the amount of money in the Treasury that may be obligated.  When the executive branch engages in an obligation of funds not yet appropriated, it is, as a practical matter, spending those funds.  Section 1342 purports to provide the executive branch with a blank check to be used during a lapse of appropriations.  That is plainly in conflict with the Appropriations Clause, and it cannot be rationalized as a proper delegation of legislative authority.

It would be no answer to argue Section 1342 contains standards governing the objectives to be served by the executive's obligations of funds, i.e., the circumstances under which the executive branch may "employ personal services." As discussed above, the Appropriations Clause's purpose is to have the direct representatives of the people determine both the object of the expenditure and its amount before money may be drawn from the Treasury.  The latter often "reflect[s] Congress' estimation of the object's value at a given time or Congress' determination that additional financing from the public fisc is not desirable."  Kate Stith, Congress' Power of the Purse, 97 Yale L. J. 1343, 1354 (1988).  Indeed, "in

determining whether a grant of spending authority is a constitutional appropriation
. . . [w]hat matters is whether Congress in fact determines how much funding for a
government activity is 'appropriate.'" Id. at 1346.[3]

### B.    OMB's Directive to Agencies Conflicts with Section 1342 of the Antideficiency Act.

NTEU argues in the alternative that, even if Section 1342 of the
Antideficiency Act is constitutional, the OMB directive on which agencies are
relying to except employees from the partial government shutdown conflicts with
Section 1342's plain text.

Section 1342 provides that the United States may "employ personal services
exceeding that authorized by law" in "emergencies involving the safety of human
life or the protection of property."  31 U.S.C. § 1342.  In 1990, Congress amended
Section 1342 to provide explicitly that "[a]s used in this section, the term
'emergencies involving the safety of human life or the protection of property' does
not include ongoing, regular functions of government the suspension of which would
not imminently threaten the safety of human life or the protection of property."

Congress added this clarifying and limiting language in 1990 because of
"what the conferees believe[d] might be an overly broad interpretation" by the
Attorney General in 1981 "regarding the authority for the continuance of
Government functions during the temporary lapse in appropriations, and [to] affirm

---

[3] NTEU notes for the Court that it previously raised this constitutional claim
before Judge Sullivan during the 1995 federal government shutdown.  Judge
Sullivan never reached the merits of the claim.  He denied NTEU's request for
temporary relief in an unpublished decision and then later dismissed the action as
moot.  See Am. Fed. of Gov't Emps. et al v. Rivlin, 995 F. Supp. 165 (D.D.C. 1998).

that the constitutional power of the purse resides with Congress." H.R. Conf. Rep. No. 101-964, at 1170 (1990). That "overly broad interpretation" (id.), however, continues to be endorsed by OMB in the OMB directive at issue.

On January 19, 2018, Defendant Mulvaney, Director of OMB, sent a memorandum to the heads of all executive departments and agencies, requiring that they review and, if needed, update their contingency plans for agency operations during a lapse in appropriations. Memorandum for the Heads of Executive Departments and Agencies, from Mick Mulvaney, Director, Re: Planning for Agency Operations During a Potential Lapse in Appropriations (Jan. 19, 2018) ("Directive").[4] The OMB directive directs agencies to OMB Circular A-11. The directive further states that agencies "should refer to relevant legal opinions issued by the Attorney General and the Office of Legal Counsel of the Department of Justice, which set forth the legal requirements imposed by the Antideficiency Act (Act) during a lapse in appropriations and the guiding standards agencies should use in making decisions under the Act during a lapse in appropriations." Directive at 1. OMB Circular No. A-11, at Section 124, points agencies to Office of Legal Counsel (OLC) opinions from 1995, 1981, and 1980 for guidance on the Antideficiency Act, as applied during a lapse in appropriations.

The 1995 OLC opinion to which OMB directs executive branch agencies states that, "even after the 1990 amendment" to the Antideficiency Act (discussed above), the Attorney General's 1981 broad construction of the Antideficiency Act's

---

[4] A copy of this directive is available at https://www.whitehouse.gov/wp-content/uploads/2017/11/m-18-05-REVISED.pdf.

emergency exception was still "fair."  <u>See</u> Memorandum for Alice Rivlin, Director,
Office of Management and Budget, from Walter Dellinger, Assistant Attorney
General, Office of Legal Counsel, Re: Government Operations in the Event of a
Lapse in Appropriations at 8 (Aug. 16, 1995).  The 1995 OLC opinion thus goes on to
reiterate the very interpretation of Section 1342's emergency exception that
Congress viewed as overbroad and from which it consciously departed through the
1990 amendment:  that, for the exception to apply, there need only be "<u>some</u>
<u>reasonable and articulable connection</u> between the function to be performed and the
safety of human life or the protection or property" and "there is "<u>some reasonable</u>
<u>likelihood</u> that the safety of human life or the protection of property would be
compromised, in some degree, by the delay in the performance of the function in
question."  <u>Id.</u> at 8 (adding that "to forestall possible misinterpretations, the second
criteria's use of the phrase 'in some degree' should be replaced with the phrase, 'in
some significant degree'") (emphases added).

The 1995 OLC opinion's overbroad test—requiring only a "reasonable"
connection to protecting life or property and only a "reasonable likelihood" that life
or property would be compromised if the employee did not continue to perform his
or her official functions—is inconsistent with the plain text of Section 1342.  That
text was amended to make clear that the Antideficiency Act requires the existence
of an "imminent[] threat[]" to human safety or property to justify continued work
during a lapse in appropriations.  31 U.S.C. § 1342.

Acting pursuant to the OMB directive and the 1995 OLC opinion endorsed by OMB, federal agencies implicated by the current lapse in appropriations drew up contingency plans designating tens of thousands of NTEU-represented employees as excepted employees, whose services could be required in a government shutdown, notwithstanding the Antideficiency Act.  Ex. 1, Decl. of Kenneth J. Moffett, Jr. ¶ 3. Many of the employees designated as excepted, in accordance with the OMB directive, including many members of Plaintiff NTEU, are persons whose services involve only "the ongoing, regular functions of government, the suspension of which would not imminently threaten the safety of human life or the protection of property."  31 U.S.C. § 1342.  Ex. 1, Decl. of Kenneth J. Moffett, Jr. ¶ 4.  Their excepted status is thus inconsistent with the plain text of the Antideficiency Act.

There is, moreover, a substantial likelihood that thousands more NTEU-represented employees will soon be designated as excepted and called back into service during the current shutdown.  Ex. 1, Decl. of Kenneth J. Moffett, Jr. ¶ 5. The President has declared that the partial government shutdown will not delay the issuance of federal tax refunds—even though there are not enough employees at IRS working during the lapse in appropriations to fulfill this promise.  See Darla Mercado, "White House Promises Tax Refunds Will Go Out, But There's Hardly Anyone At The IRS To Do The Work," CNBC.com (Jan. 7, 2019) (noting that 12% of IRS employees are working during the lapse in appropriations).

Based on information that it has been given from IRS, Plaintiff NTEU believes that approximately 45,000 employees—most of them bargaining unit

13

employees represented by NTEU—will soon be forced to return to work during the lapse in appropriations, even though their jobs do not entail protecting human life or property (let alone human life or property facing an imminent threat).  31 U.S.C. § 1342.  Ex. 1, Decl. of Kenneth J. Moffett, Jr. ¶ 5.  These employees, instead, process federal tax returns, and they would be called back to do that same work, so that the President can fulfill his promise that federal tax refunds will be timely processed.  Ex. 1, Decl. of Kenneth J. Moffett, Jr. ¶ 6.  This call-back of tax-processing employees—which is believed to be imminent, Ex. 1, Decl. of Kenneth J. Moffett, Jr. ¶ 6—would further demonstrate how agencies, relying upon the OMB directive and the authorities to which it directs them for guidance on lapses in appropriations, are acting flatly contrary to Section 1342's plain text.

In sum, the OMB directive is inconsistent with the plain text of the Antideficiency Act.  It thus constitutes unlawful agency action within the meaning of the Administrative Procedure Act, 5 U.S.C. § 701, et seq.

## II.    NTEU and Its Members Will Suffer Irreparable Harm if Immediate Injunctive Relief Does Not Issue.

A party seeking immediate injunctive relief must show that, without it, "the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.'" Sierra Club, 990 F. Supp. 2d at 38 (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 2013)).  That prerequisite is satisfied here.

NTEU-represented excepted employees who are being required to work despite the lapse in appropriations have been told that they will not be paid during

the period of lapsed appropriations for that work.  Indeed, these employees' most recent regularly scheduled payday has passed without a cent being paid to them for their labors.  See, e.g., Brady McCombs and Juliet Linderman, Payday Without Pay Hits Federal Workers As Shutdown Drags On, WashingtonPost.com (Jan. 10, 2019). These employees, moreover, have substantial reason to believe that more paydays will pass before the partial government shutdown ends and funds are appropriated. See, e.g., Hayley Miller, "Mick Mulvaney: Government Shutdown Likely To 'Drag On A Lot Longer,'" HuffingtonPost.com (Jan. 6, 2019).

Numerous NTEU members who are working for the federal government without pay are suffering or will imminently suffer financial losses that will not be recouped, even if Congress retroactively issues them back pay in the future.  Many cannot, or soon will be unable to, meet existing financial obligations without incurring debt, for which interest will accrue.  Ex. 2, Decl. of James Bailey ¶ 9. Many of these same individuals, in contrast to their colleagues who have been furloughed, cannot seek additional work for pay during this lapse in appropriations, thus losing out on the opportunity to work for pay because of their excepted status. Ex. 2, Decl. of James Bailey ¶ 10.

Indeed, NTEU-represented excepted employees desperate to earn money cannot even use their annual leave to look for another job.  Ex. 2, Decl. of James Bailey ¶ 11.  It is difficult to overstate the Catch 22 that these employees are in. Not only do they have to report to work without the prospect of payment during the lapse in appropriations, they are not allowed the time to look for and secure a job

that would allow them to earn a living now.  Ex. 2, Decl. of James Bailey ¶¶ 6, 10.

If they, without authorized leave, spend time on the clock looking for a paying job,

they might lose their federal employment.  Ex. 2, Decl. of James Bailey ¶¶ 7, 11.

But if they do not look for a paying job, they cannot earn money for the foreseeable

future.

Because they are technically working, moreover, these excepted employees

are unable to seek unemployment compensation in many states, unlike their

furloughed colleagues who are generally able to do so.  Ex. 2, Decl. of James Bailey

¶ 12.  And even though they are working without pay, they must continue to pay

costs attendant with their unpaid work, such as childcare and transportation.  Ex.

2, Decl. of James Bailey ¶ 13.  Further, given the uncertainty as to when they might

receive their next paycheck, these same employees have to make difficult choices

about goods and services that they may have to forgo and which they might

otherwise buy if they were being paid.  Ex. 2, Decl. of James Bailey ¶ 14.

These employees, at bottom, are in an entirely untenable situation.  That

situation is made possible by the unconstitutional Section 1342, which allows this

forced and unpaid labor.  It is exacerbated, moreover, by the illegal OMB directive,

which agencies rely on to radically broaden the group of employees who may be

forced to work during a lapse in appropriations.  As discussed above, it is

substantially likely that IRS, guided by OMB's directive, will soon recall 45,000

employees who, instead of protecting life or property from imminent threat, will

help process tax returns.  Ex. 2, Decl. of Kenneth Moffett Jr. ¶¶ 5, 6.  Immediate

injunctive relief is necessary to prevent irreparable harm—and in some cases further irreparable harm—to NTEU members who are excepted employees or will soon join the ranks of those employees.

### III.   The Balance of Equities Tips in NTEU's Favor, and the Public Interest Will Be Served by Immediate Injunctive Relief.

Finally, the balance of equities supports a grant of immediate injunctive relief.  As explained above, NTEU and its members will suffer several different types of irreparable harm if immediate injunctive relief does not issue.  There is, moreover, a clear public interest in maintaining the constitutionally prescribed balance of power between the legislative and executive branches in connection with the expenditure of funds from the Treasury.  In other words, there is a strong public interest in requiring the political branches to fulfill their constitutional obligation to enact spending legislation as Article I requires.

An order from this Court directing the federal government to stop requiring its employees to work without pay need not result in a disruption of public services.  To guard against this possibility, it would be appropriate to stay such an order for seventy-two hours.  That would allow the political branches time to enact legislation that would permit the government to fully operate and for federal employees to be paid for their labor.

In sum, this Court has the obligation to require the other branches of government to perform their constitutionally assigned duties.  NTEU thus respectfully submits that an order granting its request for immediate injunctive relief is in the public interest and should issue.

17

## CONCLUSION

For the foregoing reasons, Plaintiff NTEU requests that this Court grant the temporary and preliminary injunctive relief set out in its proposed order.

Respectfully submitted,

/s/ Gregory O'Duden

_____
GREGORY O'DUDEN
General Counsel

/s/ Larry J. Adkins

_____
LARRY J. ADKINS
Deputy General Counsel

/s/ Paras N. Shah

_____
PARAS N. SHAH
Assistant Counsel

/s/ Allison C. Giles

_____
ALLISON C. GILES
Assistant Counsel

/s/ Jessica Horne

_____
JESSICA HORNE
Assistant Counsel

NATIONAL TREASURY EMPLOYEES UNION
1750 H Street, N.W.
Washington, D.C.  20006
Tel:  (202) 572-5500
Fax:  (202) 572-5645
greg.oduden@nteu.org
larry.adkins@nteu.org
paras.shah@nteu.org
allie.giles@nteu.org
jessica.horne@nteu.org

January 13, 2019          Attorneys for Plaintiff NTEU

18