UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA



FILED
MAR 16 2020
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, ) ) ) | |
| Plaintiff, ) ) | Civil Case No. 19-50 (RJL) |
| v. ) ) | |
| UNITED STATES OF AMERICA, *et al.*, ) ) | |
| Defendants. ) | |

| | |
|---|---|
| JANETTE HARDY, *et al.*, ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | Civil Case No. 19-51 (RJL) |
| DONALD J. TRUMP, *et al.*, ) ) | |
| Defendants. ) ) | |

## MEMORANDUM OPINION

(March 16th, 2020)

Federal employees Brandi and Justin Thornton ("individual plaintiffs") and National Treasury Employees Union ("NTEU"), a labor organization representing over one hundred thousand federal employees, allege that the United States, President Donald J. Trump, and several Executive Branch officials (collectively, "the Government") violated the United States Constitution and various federal statutes by compelling federal employees to work without pay during the 2018 lapse in funding for certain Executive

Branch agencies ("government shutdown" or "shutdown"). *See NTEU v. United States*, 19-cv-50; *Hardy v. Trump*, 19-cv-51. Both the individual plaintiffs and NTEU (collectively, "plaintiffs") claim that the Anti-Deficiency Act, 31 U.S.C. § 1342—which, subject to certain exceptions, prohibits government expenditures or obligations absent available appropriations—violates the Appropriations Clause of the United States Constitution by authorizing Executive Branch agencies to "obligate funds without limitation," *see* Hardy Am. Compl. ¶¶ 59–60 [19-cv-51 Dkt. # 7]; NTEU Am. Compl. ¶¶ 41–45 [19-cv-50 Dkt. # 13]; *see also* NTEU Opp. to Mot. to Dismiss ("NTEU Opp'n") at 2 [19-cv-50 Dkt. # 27]. Plaintiffs further contend that even if the Anti-Deficiency Act is constitutional, the Government violated it by requiring them to work during the shutdown. Hardy Am. Compl. ¶¶ 71–74, 80, 86; NTEU Am. Compl. ¶¶ 46–50. The individual plaintiffs also assert that the Government's actions violated the Fifth and Thirteenth Amendments to the United States Constitution. Hardy Am. Compl. ¶¶ 39–56.[1] For its part, NTEU separately claims that the Government's conduct constituted unlawful agency action in violation of the Administrative Procedures Act ("APA"). NTEU Am. Compl. ¶¶ 49, 54.

Shortly after filing suit, plaintiffs moved for temporary restraining orders and preliminary injunctive relief, seeking to prohibit the Government from requiring them to report to work during the shutdown. NTEU Mot. for Temp. Restraining Order [19-cv-50

---

[1] Individual plaintiffs also brought a claim under the Fair Labor Standards Act, Hardy Am. Compl. ¶ 67, which they are no longer pursuing, Hardy Opp. to Mot. to Dismiss ("Hardy Opp'n) at 1 n.1 [19-cv-51 Dkt. # 42].

2

Dkt. # 8]; Hardy Mot. for Temp. Restraining Order [19-cv-51 Dkt. # 8]. After a hearing, I denied plaintiffs' request for a temporary restraining order, but deferred ruling on their motions for a preliminary injunction. *See* 1/15/19 Minute Order. Before briefing on those motions was complete, the shutdown ended, seemingly mooting plaintiffs' claims.[2] Plaintiffs maintain, however, that their claims should not be dismissed because another shutdown could occur in the future, causing them the same harm. Pending before me is the Government's combined motion to dismiss plaintiffs' amended complaints for lack of jurisdiction. *See* Defendants' Combined Mot. to Dismiss ("Gov't Mot.") [19-cv-50 Dkt. # 26; 19-cv-51 Dkt. # 26]. Upon consideration of the briefing, oral argument, the relevant law, the entire record, and for the reasons stated below, the Government's motion to dismiss is **GRANTED**.

## BACKGROUND

### I. Relevant Law

The Appropriations Clause of the United States Constitution provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const., art. I, § 9, cl. 7. The meaning of the clause is straightforward: Congress has exclusive power over the federal purse, and no money can be disbursed from the Treasury absent an appropriation by Congress. *OPM v. Richmond*, 496 U.S. 414, 424 (1990). Congress's exclusive authority in this area is reaffirmed by federal statute. For

---

[2] Based on past practices, excepted employees are paid back pay for work performed during a shutdown after that shutdown ends. *See* Defs.' Combined Mot. to Dismiss ("Gov't Mot.") at 31 [19-cv-50 Dkt. # 26; 19-cv-51 Dkt. # 26]; *see also* 31 U.S.C. § 1341(c)(2) (guaranteeing pay for furloughed and excepted employees at the earliest date after the lapse in appropriations ended).

3

instance, the Anti-Deficiency Act prohibits federal officers and employees from authorizing expenditures in excess of the amount of appropriations made available by Congress, and it further prevents them from entering into contracts "for the payment of money before an appropriation is made unless authorized by law." 31 U.S.C. § 1341(a)(1)(A)–(B) (emphasis added). The Act contains an exception to this general prohibition under which the Government may "accept voluntary services . . . or employ personal services exceeding that authorized by law" only in "emergencies involving the safety of human life or the protection of property." *Id.* § 1342. But, as the statutory language makes clear, the emergency exception is narrow; it does not cover the "ongoing, regular functions of government the suspension of which would not imminently threaten the safety of human life or the protection of property." *Id.*

In accordance with the Appropriations Clause and the Anti-Deficiency Act, federal agencies must cease their activities if Congress does not appropriate funding, unless those activities qualify as an exception to the Anti-Deficiency Act. The Department of Justice ("DOJ") provides its own guidance as to what types of activities qualify as exceptions. *See Gov't Operations in the Event of a Lapse in Appropriations*, 1995 OLC Op., 1995 WL 17216091; *see also Auth. for the Continuance of Gov't Functions During a Temp. Lapse in Appropriations*, 1981 OLC Op., 1981 WL 30865. In its view, two criteria must be satisfied with respect to the "emergency" exception created by the Act: "First, there must be some reasonable and articulable connection between the function to be performed and the safety of human life or the protection of property;" and "[s]econd, there must be some reasonable likelihood that the safety of human life or the protection of property would be

4

compromised, in some [significant] degree, by delay in the performance of the function in question." *Id.* at *6.³ Apart from the "emergency" exception, DOJ also considers certain activities as exceptions if they are related to other government functions that Congress *did* decide to fund; in those circumstances, funding for unfunded activities is, in DOJ's view, "necessarily implied" by funding for the related functions. 1995 WL 17216091 at *3. Relying on DOJ's guidance, the Office of Management and Budget ("OMB") directs agencies to prepare "contingency plans" that designate which activities and employees are to be excepted in the event of a government shutdown. *See* NTEU Am. Compl. ¶ 14; *see also id.* ¶¶ 15, 20.

## II. Factual Background

On December 22, 2018, funding for several Executive Branch agencies lapsed, triggering a partial government shutdown. NTEU Am. Compl. ¶ 8; Hardy Am. Compl. ¶ 26. Affected agencies accordingly ceased performing certain activities but, pursuant to their contingency plans, deemed thousands of federal employees "excepted" under the Anti-Deficiency Act, including thousands of NTEU members and the individual plaintiffs. *See* NTEU Am. Compl. ¶¶ 9, 20, 21; Hardy Am. Compl. ¶¶ 27, 28, 33. Those employees were required to work without pay while the lapse in funding continued. NTEU Am.

---

³ The Department of Justice issued its guidance in 1995, after the Anti-Deficiency Act was amended in 1990. For the most part, it reaffirmed the Attorney General's 1981 interpretation of the emergency exception but added the word "significant" to its second criterion to "forestall possible misinterpretations" of its opinion. 1995 WL 17216091, at *6.

5

Compl. ¶¶ 9, 22; Hardy Am. Compl. ¶ 29.

Three weeks after the partial shutdown began, plaintiffs each filed suit challenging the Government's decision to require them to report to work. *See generally* NTEU Compl. [19-cv-50 Dkt. # 1]; Hardy Compl. [19-cv-51 Dkt. # 1].[4] They also filed motions for temporary restraining orders ("TROs") and preliminary injunctive relief. *See* NTEU Mot. for Temp. Restraining Order; Hardy Mot. for Temp. Restraining Order. I held a hearing on those motions on January 15, 2019. Emphasizing that the shutdown was a budgetary dispute that should be solved by the political branches, I orally denied plaintiffs' requests for temporary restraining orders, and I subsequently issued a written order memorializing my reasoning. *See* 1/15/19 Order at 1 [19-cv-50 Dkt. # 16; 19-cv-51 Dkt. # 19].[5] I deferred ruling on plaintiffs' requests for preliminary injunctive relief until the parties completed briefing on those motions. *Id.*

On the same day as the TRO hearing, the Internal Revenue Service ("IRS") issued an updated contingency plan, recalling thousands of previously-furloughed IRS employees for the purpose of processing federal tax refunds. *See* NTEU Am. Compl. ¶¶ 24, 29. President Trump had previously announced that the shutdown would not delay the issuance

---

[4] Individual plaintiffs' suit initially included federal employees Janette Hardy and Kristen Rohde. Those individuals, however, voluntarily dismissed their claims on December 2, 2019. Notice of Voluntary Dismissal [19-cv-51 Dkt. # 48]. A group of air traffic controllers and their union also filed a similar suit on January 11, 2019. *Nat'l Air Traffic Controllers Ass'n v. United States*, Civ. A. No. 19-cv-62 (RJL) (D.D.C. 2019) [Dkt. # 1]. On February 15, 2019, they voluntarily dismissed their claims. *See* Notice of Voluntary Dismissal [19-cv-62 Dkt. # 21].

[5] After the January 15, 2019 hearing, the President signed into law the Government Employee Fair Treatment Act of 2019, which guaranteed furloughed and excepted employees would be paid during the lapse in appropriations. *See* 31 U.S.C. § 1341(c).

6

of federal tax refunds, and the IRS announced its intention to require 46,052 employees to work during the shutdown, a significant increase from the 9,946 employees excepted under its original contingency plan. *See id.* ¶¶ 25, 27, 28. According to the IRS, those additional employees were now designated "excepted" under both the Anti-Deficiency Act's emergency exception and the "necessarily implied by law" exception. *See id.* ¶¶ 24, 28, 29, 31. Shortly after the TRO hearing, NTEU amended its complaint, adding allegations regarding the updated IRS contingency plan. *See id.*

On January 25, 2019, before the parties' briefing was complete on plaintiffs' motions for preliminary injunctive relief, the Government temporarily restored funding for three weeks, and plaintiffs withdrew their motions. NTEU Notice of Withdrawal [19-cv-50 Dkt. # 20]; Hardy Notice of Withdrawal [19-cv-51 Dkt. #22]. I held a status conference on January 31, 2019 and, to prevent delays should another shutdown occur when Congress's temporary funding lapsed, set a briefing schedule for any subsequent preliminary injunction motions. *See* 1/31/19 Minute Order. On February 15, 2019, however, Congress enacted appropriations for the remainder of the fiscal year. *See* Consolidated Appropriations Act, 2019, Pub. L. No 116-6, 133 Stat. 13. I held another status conference on February 22, 2019. At that hearing, the Government asserted that the appropriations mooted plaintiffs' claims and deprived this Court of jurisdiction to adjudicate them; plaintiffs countered that an exception to mootness doctrine applied because their claims were capable of repetition but evaded review. See. 2/22/19 Tr. at 5:23-25; 7:6-7; 7:18-25. The Government moved to dismiss plaintiffs' suits for lack of jurisdiction on March 19, 2019. *See* Gov't Mot. The parties completed briefing on the

7

Government's motion on April 23, 2019, and I held oral argument on December 4, 2019.

## LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(1), the Government moves to dismiss plaintiffs' complaints for lack of subject matter jurisdiction, contending plaintiffs claim are moot. Gov't Mot. at 10–12. Although the Government must establish mootness, plaintiffs bear the burden of showing an exception to mootness applies. *S. Co. Servs., Inc. v. FERC*, 416 F.3d 39, 43 (D.C. Cir. 2005). "In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiffs." *Logan v. Dep't of Veterans Affairs*, 357 F. Supp. 2d 149, 153 (D.D.C. 2004) (internal quotation marks omitted). "[W]hen the inquiry focuses on the Court's power to hear the claim, the Court may give the plaintiff's factual allegations closer scrutiny and may consider materials outside the pleadings." *Id.*

## ANALYSIS

Under Article III of the Constitution, federal courts have the authority to adjudicate only "Cases" and "Controversies" between adverse litigants. *Raines v. Byrd*, 521 U.S. 811, 818 (1997); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982). Accordingly, "to invoke federal-court jurisdiction, a plaintiff must demonstrate that he possesses a legally cognizable interest, or personal stake, in the outcome of the action." *Genesis HealthCare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013) (internal quotation marks omitted). "This requirement ensures that the Federal Judiciary confines itself to its constitutionally limited role of adjudicating actual

8

and concrete disputes, the resolutions of which have direct consequences on the parties involved." *Id.* And, as Chief Justice Roberts himself pointed out in *Already, LLC v. Nike, Inc.*, "an actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation." 568 U.S. 85, 90–91 (2013) (internal quotation marks omitted). Should "an intervening circumstance deprive[] the plaintiff of a personal stake in the outcome of the lawsuit," the suit is no longer a "Case" or "Controversy" and "must be dismissed as moot." *Genesis Healthcare*, 569 U.S. at 72 (internal quotation marks omitted); *see also United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1537 (2018) (recognizing that a moot case "is outside the jurisdiction of the federal courts").

The Government contends that Congress's February 15, 2019 appropriations ended the shutdown and mooted plaintiffs' claims, meaning I no longer have jurisdiction over them. Gov't Mot. at 10–11. Not surprisingly, plaintiffs disagree. Although they do not contest mootness, plaintiffs contend an exception to mootness applies because their claims are capable of repetition yet evading review. *See* NTEU Opp'n at 1, 4; Hardy Opp. to Mot. to Dismiss ("Hardy Opp'n") at 1 [19-cv-51 Dkt. # 42]. That doctrine, however, applies "only in exceptional situations," *Spencer v. Kemna*, 523 U.S. 1, 17 (1998), where the party opposing dismissal establishes "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again," *Sanchez-Gomez*, 138 S. Ct. at 1540; *S. Co. Servs.*, 416 F.3d at 43 (recognizing that the party opposing jurisdictional dismissal bears the burden of proving mootness exception applies). Plaintiffs argue both requirements are satisfied here because another shutdown *could* occur

in the future, and any claims arising from it would likely not be resolved before federal funding is restored. NTEU Opp'n at 5–6; Hardy Opp'n at 3–5. Thus, in plaintiffs' view, their claims remain live and should be passed on by this Court. Unfortunately for plaintiffs, I disagree.

As an initial matter, I "must first determine exactly what must be repeatable . . . to save the case from mootness" in order "to decide whether the same type of []action . . . is sufficiently likely to recur." *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 322 (D.C. Cir. 2009) (internal quotation marks omitted) (some alterations). The relevant "wrong" capable of repetition "must be defined in terms of the *precise* controversy it spawns," rather than a generalized or speculative future harm. *See People for Ethical Treatment of Animals, Inc. ("PETA") v. Gittens*, 396 F.3d 416, 422 (D.C. Cir. 2005) (emphasis added). "This demand for particularity ensures 'that courts resolve only continuing controversies between the parties.'" *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 15 (D.C. Cir. 2019) (quoting *PETA*, 396 F.33d at 422). "Courts have 'interpreted "same action" to refer to particular agency policies, regulations, guidelines, or recurrent identical agency actions.'" *Beethoven.com LLC v. Librarian of Congress*, 394 F.3d 939, 951 (D.C. Cir. 2005) (quoting *Public Utilities Comm'n of Cal. v. FERC*, 236 F.3d 708, 714–15 (D.C.Cir.2001)). Here, the "action" or "harm" capable of repetition is Congress's failure to appropriate adequate federal funding for certain Executive agencies—including the IRS, DOJ, the Department of Transportation, and the Department of Agriculture—and those agencies' subsequent decisions to require federal-employee plaintiffs to report to work, despite the lapse in appropriations.

That specific controversy, however, is not "capable of repetition." To establish that claims are "capable of repetition," plaintiffs must show "a reasonable expectation or demonstrated probability that the action will recur;" "[a] theoretical possibility," however, "is not sufficient to qualify as capable of repetition . . . ." *Senate Permanent Subcommittee on Investigations v. Ferrer*, 856 F.3d 1080, 1088 (D.C. Cir. 2017) (quoting *Beethoven.com*, 394 F.3d at 951) (internal quotation marks omitted). Our Circuit Court's case law sheds light on when that standard is satisfied. Claims *are* capable of repetition when the legal controversy is "fixed, knowable in advance, and thus predictably repeatable." *Reid v. Hurwitz*, 920 F.3d 828, 840 (D.C. Cir. 2019) (Katsas, J., dissenting). For instance, in *Del Monte Fresh Produce Co. v. United States*, our Circuit Court considered a produce distributor's claims that a government agency unreasonably delayed adjudicating its export license application. 570 F.3d at 320–21. The agency ultimately granted that particular license while the litigation was pending, and the district court dismissed the case as moot. *Id.* at 321. Our Circuit Court reversed, holding that the distributor's claims were *not* moot, but rather capable of repetition because the legal wrong at issue—the agency's alleged violation of a federal statute that required it to adjudicate a properly-prepared license within nine days—was reasonably likely to recur. *Id.* at 324–25. Significantly, that dispute hinged on the narrow and repeatable issue of whether the relevant statutory deadlines applied to the agency and were mandatory. *Id.* It did not, however, depend on any of the specific facts underlying plaintiff's license application.

Similarly, in *Christian Knights of the Ku Klux Klan v. District of Columbia*, our Circuit concluded that a dispute over whether the District of Columbia could restrict the

11

Ku Klux Klan's permit to march in the District due to threatened violence *was* capable of repetition. 972 F.2d 365, 367, 370 (D.C. Cir. 1992). There, the court reasoned that it was reasonably likely that the same plaintiff would again seek the same kind of permit. *Id.* at 370. The court pointed to: the fact that the District is a "perennial favorite for demonstrations;" prior marches by the KKK in D.C.; and the KKK's general "resolve[] to continue marching," including its representations that it "regularly" conducts such marches. *Id.* at 370, 371. All told, the court was "confident" that the KKK would again attempt to march in the District, and it accordingly concluded the dispute was not moot. *Id.* at 371.

By contrast, claims are not "capable of repetition" if they are "highly fact-specific." *PETA*, 396 F.3d at 424. In *PETA v. Gittens*, our Circuit Court held that plaintiff's First Amendment claims against the District of Columbia Arts Commission for alleged impermissible viewpoint discrimination were *not* capable of repetition because they "turn[ed] on exactly what . . . criteria" the Commission used to exclude PETA's piece of artwork from a government-sponsored exhibit, while also approving other designs that PETA claimed were analogous. *Id.* at 423–24. As the Circuit explained, for the particular harm to PETA to recur, "[t]he District would have to sponsor another such public arts display; it would have to call upon private parties to participate in the design of the objects . . . [;] PETA would have to believe it could advance its cause by participating in the program; PETA would have to submit a proposed design; the Commission would have to reject it as inconsistent with Commission's criteria; at the same time, the Commission would have to approve other designs not meeting its criteria; and those non-conforming

12

designs would have to be analogous to the design PETA submitted." *Id.* at 424. In our Circuit Court's view, the wrong suffered by PETA was unlikely to recur because such "a sequence of coincidences" was "too long to credit." *Id.*

So too here. Unlike the relatively static nature of the issues in *Christian Knights* and *Del Monte*, the facts and circumstances of a possible future lapse in appropriations are *not*—to say the least—fixed, knowable, and predictably repeatable. To the contrary, they depend on a series of circumstance-specific political calculations that are, by their very nature, nearly impossible to predict. *See Beethoven.com LLC*, 394 F.3d at 951 (concluding claims were not capable of repetition where an agency decision was "motivated by factors unique" to that particular situation). As the Government points out, numerous contingencies related to a possible future shutdown include: if, when, and under what circumstances Congress might decide to let appropriations lapse; what agencies would be affected by such a lapse, which in turn depends on Congress's decision to continue to funds certain agencies and not others in the event of a shutdown; and how the affected agencies will respond, including the terms of their contingency plans as well as their circumstance-specific decisions about whether to except certain employees, including the plaintiffs here. *See* Gov't Mot. at 16–19. Thus, in order to conclude plaintiffs will face the same harm in the future, I would have to assume a shutdown will occur, the same agencies will be affected, those agencies will react the same way again, and those agency decisions will affect the same plaintiffs. Like the fact-specific controversy in *PETA*, that chain of political

events is simply "too long to credit." 396 F.3d at 424.[6]

Indeed, events that transpired during this litigation only confirm the speculative nature of plaintiffs' claims. For instance, in opposing the Government's motion to dismiss, the individual plaintiffs posited it was likely Congress would not pass any appropriations in September 2019, thereby triggering another shutdown. See Hardy Opp'n at 5. It also predicted that Congress would fail to raise the debt ceiling before the end of the fiscal year and, again, cause another shutdown. *Id.* Of course, neither came to pass.

If the foregoing were not enough, our Circuit Court has twice affirmed district court decisions holding that claims arising from past government shutdowns are too speculative to satisfy the capable-of-repetition exception to mootness. *See Leonard v. United States Dep't of Defense*, 598 F. App'x 9, 10 (D.C. Cir. 2015) (2013 shutdown); *Am. Fed'n of Gov't Employees ("AFGE") v. Raines*, No. 98-5045, 1998 WL 545417 (D.C. Cir. 1998) (1995 shutdown). Although those opinions are—as plaintiffs emphasize—unpublished and lack detailed analysis, they nevertheless provide further confirmation that plaintiffs' claims cannot proceed. As the district court reasoned in *AFGE*, "[i]t would be entirely speculative for this Court to attempt to predict if, and when, another lapse in appropriations may occur, how long that lapse might be, which agencies might be subject to the lapse, which employees might be affected, and whether employees will be required to work

---

[6] NTEU's status as an organization does not save its claims from mootness. Although NTEU purports to bring suit on behalf of itself *and* its members, NTEU Am. Compl. ¶ 4, it does not allege any harm to NTEU; it therefore brought suit in its associational capacity on behalf of its members, *see id.* ¶¶ 23, 45, 50, 53 (asserting injury to NTEU members). Because NTEU's members' claims are moot, NTEU's claims are likewise moot. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 494–95 (2009).

14

without compensation." *AFGE v. Rivlin*, 995 F. Supp. 165, 166 (D.D.C. 1998), *affirmed sub nom. AFGE v. Raines*, 1998 WL 545417. That reasoning, which our Circuit Court summarily affirmed, applies with equal force here.[7]

Plaintiffs' arguments to the contrary are not persuasive. Plaintiffs contend that only their "alleged legal injury" must be capable of repetition, not "every legally relevant characteristic" to the legal challenge. *See* NTEU Opp'n at 6 (quoting *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 463 (2007)); Hardy Opp'n at 8 (same). Thus, in plaintiffs view, because another shutdown is likely to occur at some point in the future, their claims are capable of repetition; the other contingencies identified above are simply underlying facts or characteristics of their legal challenge that are irrelevant to the capable-of-repetition analysis. NTEU Opp'n at 6–7; *see also* Hardy Opp'n at 8. Plaintiffs are wrong. It is *not* enough for a court to simply conclude that another shutdown may occur in the future. *See Atlas Brew Works, LLC v. Barr*, 391 F. Supp. 3d 6, 16 (D.D.C. 2019) (concluding that satisfying the "threshold contingency" of a future shutdown was not sufficient to satisfy the capable-of-repetition exception). Plaintiffs must also establish that the *other* contingencies inherent in some future budgetary dispute between the two political branches are reasonably likely to recur.[8] *Id.* at 15–16. Those underlying political choices, or

---

[7] Plaintiffs contend these cases have no persuasive force because, in the time since, "the political branches have demonstrated a decreasing ability to fund the government continuously." NTEU Opp'n at 12; *see also* Hardy Opp'n at 5. But plaintiffs miss the point: the recurrence of another shutdown at some point in the future does not alone render their particular claims capable of repetition. *See infra* at 15–16.

[8] NTEU submits that because another shutdown is likely to recur, at the very least its Appropriations Clause claim is capable of repetition. NTEU Supp. Submission at 5 [19-cv-50 Dkt. # 38]. In its view, the Court "need only conclude that it is reasonable to expect that the future

15

"contingencies," are not simply irrelevant facts underlying this legal challenge; they determine the nature of the harm to plaintiffs and, indeed, whether the plaintiffs are harmed *at all*. And although it may be true, as plaintiffs urge, that a shutdown is likely to occur *at some point* in the future, uncertainty as to *when* it will occur only highlights the difficulty in predicting the attendant political circumstances of that hypothetical shutdown, which in turn renders the numerous other contingencies identified above even more speculative.

In sum, I simply cannot conclude that it is "reasonably likely" that all of the hypothetical events detailed above will occur at the same time and harm the same plaintiffs in the same way alleged here. *See Atlas Brew Works*, 391 F. Supp. 3d at 16; *see also Fisheries Survival Fund v. Locke*, 628 F. Supp. 2d 65, 66–67 (D.D.C. 2009) (recognizing that a "hypothetical string of events" is "far too attenuated to save plaintiff's claim from a finding of mootness"). Indeed, it would be inappropriate and unwise for the Judiciary to pass judgment based on what the political Branches may or may not do at some point in the future. And here, where the underlying dispute arises from a budgetary dispute involving "complex political choices," judicial restraint is particularly appropriate. 13C FEDERAL PRACTICE & PROCEDURE § 3533.8.1 (3d ed.) ("The more complex the process—

---

lapse would affect one of the 33 federal agencies and departments at which NTEU represents employees." *Id.* NTEU cannot so easily sidestep Article III. It sued on behalf of specific members affected by the shutdown; it cannot save those claims from mootness because it is an association representing numerous federal agencies that may (or may not) be affected by a hypothetical future shutdown. The D.C. Circuit case upon which NTEU relies is not to the contrary. *See Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*, 469 F.3d 129 (D.C. Cir. 2006); 12/4/19 Tr. at 18:15-19:13. In that case, the D.C. Circuit concluded the plaintiff association *itself* had organizational standing, and it recognized that all of the association's members, who were terminally ill patients, continued to be harmed by the challenged government policy. 469 F.3d at 133–35. That is simply not the case here.

such as a legislative budgeting process—the greater the uncertainty whether the future will ever present sufficiently similar constraints and sufficiently similar responses. And the more thoroughly political the judgments, the greater the wisdom of leaving future quarrels for future decision."); *see also Nat'l Wildlife Fed'n v. United States*, 626 F.2d 917, 924 (D.C. Cir. 1980) (recognizing that disputes over the "federal budget" are "the archetype of those best resolved through bargaining and accommodation between the legislative and executive branches.").

That said, I would be remiss to let the Government's "emergency exception" claim for IRS workers go unnoted. In January 2019, the IRS recalled thousands of its employees to work, without pay, to process federal tax returns, citing, among other things, the emergency exception to the Anti-Deficiency Act. The record clearly suggests that that decision was made to avoid the anticipated political heat that would have no doubt been generated as to both Executive and Legislative officeholders had the shutdown caused delays in the disbursement of taxpayer refunds. *See supra* at 6–7. Not surprisingly, Congress has taken no remedial action in response to date, despite the IRS's dubious claim that those employees were somehow necessary for "the safety of human life or the protection of property." *See* 31 U.S.C. § 1342. Fortunately for the Government, however, not every self-serving transmogrification of the law can be righted by the courts. Plaintiffs' claims are nonetheless moot and do not satisfy the capable-of-repetition exception to mootness. I therefore lack jurisdiction to adjudicate them.

## CONCLUSION

Thus, for all of the foregoing reasons, the Government's motion to dismiss is **GRANTED**. A separate order consistent with this decision accompanies this Memorandum Opinion.

*[signature]*
RICHARD J. LEON
United States District Judge